IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02450-JLK

PETER MUNROE and
LETICIA MUNROE,

        Plaintiffs,

v.

CSAA GENERAL INSURANCE COMPANY,

        Defendant.

---

**ORDER AND OPINION ON MOTION FOR DECLARATORY JUDGMENT**

---

Kane, J.

This matter is before me on Plaintiffs' Motion for Declaratory Judgment or in the Alternative for Partial Summary Judgment. Doc. 16. For the reasons stated below, I interpret the motion solely as one for partial summary judgment and find summary judgment inappropriate. Accordingly, Plaintiffs' motion is denied.

## FACTUAL BACKGROUND

Plaintiffs Peter and Leticia Munroe ("Plaintiffs") own a home in Monument, Colorado, which they purchased in April 2015 and insured through CSAA General Insurance Company ("Defendant"). Compl. at ¶ 4; Pls.' Ex. 1 at ¶¶ 2–3. On or around May 16, 2018, water began to leak from the roof near a skylight after a series of heavy rainstorms. Compl. at ¶ 5; Doc. 16 at 1; Pls.' Ex. 1 at ¶¶ 5–6. Plaintiffs retained Campbell Roofing on May 18 to identify and caulk the leak. Compl. at ¶ 6; Doc. 16 at 1–2; Pls.' Ex. 1 at ¶ 7. They submitted a claim to Defendant on May 21. Compl. at ¶ 7; Doc. 16 at 2; Pls.' Ex. 1 at ¶ 7; Pls.' Ex. 2. Ultimately, Defendant

determined that the damage to the roof was not covered because it was considered "wear and tear," but the resulting water damage would be covered. Pls.' Ex. 5.

Plaintiffs hired Top Gun Restoration to dry the ceiling while Plaintiffs were away on a fifteen-day trip. Compl. at ¶ 8; Def. Ex. B at 1. While Plaintiffs were out of town, Top Gun notified them that the ceiling was not drying properly. Compl. at ¶ 9; Def. Ex. B at 1. Plaintiffs returned home at the end of their trip to find that Top Gun failed to dry out the ceiling and removed its equipment from Plaintiffs' home with no explanation. Def. Ex. B at 1.

Shortly thereafter, Plaintiffs noticed a new leak in the master bedroom, which had evidently existed for a while given there were stains on the ceiling near the source of the leak and on the carpet below. *Id.* Plaintiffs attempted to contact Top Gun about it but did not receive an answer. *Id.* They then contacted Servpro, another home-repair contractor. *Id.*

Servpro inspected Plaintiffs' home on June 12, 2018 and determined that the ceiling was at risk of collapse if the wet insulation was not dried properly. *Id.* Servpro planned to remove the master bedroom closet and living room ceilings and set up drying equipment by July 5. *Id.* at 2, 4. Campbell Roofing was still repairing the roof and expected to be done by June 27. *Id.* at 4. It was around this time that Plaintiffs decided to move to a hotel pending completion of all repairs. *Id.* at 5; Compl. at ¶ 12; Doc. 16 at 2; Pls.' Ex. 1 at ¶ 10.

LTS Resource, LLC, an environmental testing corporation, inspected the home on July 3. *See* Pls.' Ex. 3. It is not clear from the record who hired LTS Resource or why, but its investigation found visual evidence of mold growth and a dangerous level of spores in the air. *Id.* at 3–4; Doc. 16 at 2; Pls.' Ex. 1 at ¶ 11. On August 15, Defendant informed Plaintiffs that it would cover up to $10,000 of any mold-remediation costs subject to the policy's mold-coverage limit. Pls.' Ex. 6 at 1. Defendant also offered to cover all additional living expenses accrued

while the mold was being removed. *Id.* In conveying this offer, Defendant included a report from Gardner Roofing that found there was old water damage around the skylight and that the roof lacked any ventilation, which "possibly caused long term moisture issues in the ceiling joint cavities as evidenced by the damages seen after the drywall ceilings and insulation were removed inside the home." Def. Ex. A.

It appears that Defendant has paid Plaintiffs $31,915.90 up to this point. It sent a $7,927.62 check to cover Servpro's work in drying out the ceiling. Def. Ex. C at 2; Def. Ex. D at 1. Defendant paid out the entire mold-remediation limit in two checks—one for $625.00 to cover the mold testing done on July 3 and another for $9,375.00 to cover the balance of the policy limit. Def. Ex. H; Def. Ex. I. Finally, Defendant sent Plaintiffs a check for $13,988.28 on October 12 to cover all of Plaintiffs' hotel bills incurred up to that point. Def. Ex. C at 1; Def. Ex. E.

Defendant has not provided any compensation for living expenses besides the hotel bills because it allegedly has questions regarding how much more Plaintiffs were spending than normal. Doc. 20 at 4; Def. Ex. C at 1; Def. Ex. D at 1. It also has not paid hotel bills or other living expenses incurred after October 2018 because Plaintiffs have failed to provide the necessary documentation. *See* Def. Ex. G at 2 (identifying hotel receipts dated only through October 16, 2018 and living expense receipts through October 29, 2018 in Plaintiffs' initial disclosures). Plaintiffs are currently living in an apartment because there are still nearly $17,000 worth of repairs to complete before they may return home. Compl. at ¶ 2; Doc. 16 at 2; Pls.' Ex. 1 at ¶¶ 12, 15.

## LEGAL STANDARD

Plaintiffs move for a declaratory judgment or, in the alternative, partial summary judgment. Doc. 16. In their words, they "are asking the Court to declare that the expenses and repairs are covered under their insurance policy so that they can be reimbursed for their out of pocket and ongoing expenses, and complete repairs so that they can finally move back into their home." *Id.* at 3. As the Advisory Committee noted in promulgating Federal Rule of Civil Procedure 57:

> A declaratory judgment is appropriate when it will 'terminate the controversy' giving rise to the proceeding. Inasmuch as it often involves only an issue of law on undisputed or relatively undisputed facts, it operates frequently as a summary proceeding, justifying docketing the case for early hearing as on a motion.

Fed. R. Civ. P. 57. Plaintiffs ask for a determination of what they perceive to be undisputed material facts— the scope of the insurance policy. Because of the nature of a declaratory judgment and the remedy Plaintiffs seek, I interpret their motion as one exclusively for partial summary judgment.

Summary judgment is only appropriate if the "movant shows that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 665, 670 (10th Cir. 1998). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 114 F.3d at 670.

The moving party bears the initial burden of making a prima facie demonstration of the absence of any genuine issues as to any material fact and entitlement to judgment as a matter of law. *Id.* at 670–71; *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). If the movant meets this initial threshold, the burden shifts to the nonmoving party to "go beyond

4

the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In applying this standard, a trial court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, which is the Defendant here. *Adler*, 114 F.3d at 670.

Plaintiffs' motion focuses almost entirely on how their insurance policy should be interpreted. Courts should interpret the terms of an insurance policy by "their plain meaning according to common usage." *Shean v. Farmers Ins. Exch.*, 934 P.2d 835, 837 (Colo. App. 1996). If there are provisions that conflict with one another, the court should construe the provisions in favor of the insured. *Id.* However, courts should not attempt to rewrite insurance policy provisions that are clear and unambiguous. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. App. 2003). If an insurer seeks to limit or exclude coverage under the terms of the policy, it has "the burden of proving that a particular loss falls within an exclusion in the contract." *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008).

## DISCUSSION

Plaintiffs have two major arguments—first, the plain language of the policy unambiguously provides them with unlimited mold-remediation coverage, and second, the efficient proximate cause doctrine nonetheless requires complete coverage. Defendant, on the other hand, argues that the policy unambiguously excludes Plaintiffs' mold damage from any coverage, and it made nothing more than a business decision in offering them any money for the mold remediation or additional living expenses. Doc. 20 at 11.

Plaintiffs offer two possible readings of the policy that would provide for complete coverage of the mold remediation. I do not find either reading to be persuasive. Their first argument is that any damages resulting from wear and tear are covered under an exception to the policy; because the mold was caused by wear and tear to the roof, it should be covered in full. Doc. 16 at 5–6. The policy unambiguously excludes wear and tear from coverage. Pls.' Ex. 7 at 34. Plaintiffs are correct that the policy covers some damages that result from wear and tear, but they have misinterpreted the scope of this exception. The policy states that the exception applies only if:

> [The wear and tear] results in water damage, not otherwise excluded, to property covered under Coverages A or B, and
>
> The damage is a direct result of an accidental discharge or overflow of water or steam from within a:
>
> > (i) Storm drain, or water, steam or sewer pipe off the "residence premises"; or
> >
> > (ii) Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises".

*Id.* at 35. The ensuing water damage and mold growth was not caused by an accidental discharge from one of these enumerated sources, so the exception clearly does not apply.

Furthermore, the exception doesn't state that all ensuing damages will be covered, but rather only that "[t]he amount we will pay includes the cost to tear out and replace any part of a 'building' or other structure on the 'residence premises'; but only when necessary to repair that part of the damaged system or appliance." *Id.* On this point, then, Plaintiffs have misconstrued the policy in two ways—the exception clearly does not apply at all, and even if it did, it would not cover *all* resulting damages.

6

Plaintiffs' second argument is that mold damage is covered in full by default and is subject to the $10,000 limit only in enumerated circumstances. This argument necessitates a careful reading of the policy in its entirety. First, "Fungi" is defined as any type or form of fungus including "(a) Mold or mildew; (b) Mycotoxins; (c) Spores; or scents or by-products produced or released by any of these." It does not include fungi that is intended for human consumption. *Id.* at 6. The other relevant provisions of the policy are as follows:

**SECTION I – PROPERTY COVERAGES**

E. Additional Coverages . . .

> 16. "Fungi", Wet Or Dry Rot, Or Bacteria
>
> $5,000[1] is the most we will pay for the total of all "occurrences" during the policy period, payable under Section I, Property Coverages, caused by or consisting of "fungi", wet or dry rot, or bacteria. Occurrences may not be stacked across policy periods.
>
> (a)     This coverage only applies when:
>
>> (1)     The loss results from an accidental discharge or overflow of water from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance on the "residence premises"; and
>>
>> (2)     If the discharge or overflow of water, or the presence or condensation of humidity, moisture, or vapor and the resulting damage is unknown to all insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a "building"; and
>>
>> (3)     All reasonable means were used to save and preserve the property from further damage at and after the time of the loss.

*Id.* at 29–30. This limit applies to the cost to remove fungi, tear out or replace any part of the structure necessary to gain access to the fungi, test the air or property for the presence of fungi,

---

[1] This reading is based on an exemplar policy provided by Plaintiffs and adopted by Defendant, which has a standard $5,000 limit for mold-related repairs. However, Plaintiffs negotiated a $10,000 special mold limit in their policy. *See* Def. Ex. K.

and the reasonable and necessary increase in living expenses incurred during these repairs. *Id.* at 30–31.

## SECTION I – PERILS INSURED AGAINST

A. Coverage A – Dwelling and Coverage B – Other Structures

    1.      We insure against direct physical loss to property described in Coverages A and B.

    2.      We do not insure, however, for loss: . . .

        (c)      Caused by: . . .

            (5)      "Fungi", wet or dry rot, or bacteria except as provided by Section I – Additional Coverages Limited "Fungi", Wet Or Dry Rot Or Bacteria.

*Id.* at 32–34.

## SECTION I – EXCLUSIONS

A. We do not insure for any loss caused directly or indirectly by one or more of the excluded events set forth below in Exclusions A.1. through A.11., regardless of:

(1) the cause of the excluded event; (2) other causes of the loss; (3) whether or not the other causes of the loss acted concurrently or in any sequence with the excluded event to produce the loss; (4) whether the loss occurs suddenly or gradually or involves isolated or widespread damage; (5) whether the loss arises from natural or external forces; or (6) whether the loss occurs as a result of any combination of (1) through (5). . . .

    10.      "Fungi", Wet Or Dry Rot, Or Bacteria

            "Fungi", wet or dry rot, or bacteria meaning the presence, growth proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

            This exclusion does not apply:

        (a)      When "fungi", wet or dry rot, or bacteria results from fire or lightning; or

        (b)      To the extent coverage is provided for in the Limited "Fungi", Wet Or Dry Rot, Or Bacteria Additional Coverage under Section I.

*Id.* at 40–44.

Plaintiffs attempted to read the mold damages provision under "E. Additional Coverages" in isolation to argue that the fungi limit is applicable *only if* the mold was caused by an accidental discharge of water from a plumbing, heating, air conditioning, automatic fire protective sprinkler system or appliance within the home. Doc. 16 at 6. Because it is undisputed that the mold growth wasn't caused by one of these circumstances, Doc. 20 at 7, the argument follows that the mold limit does not apply. Doc. 16 at 6.

However, Plaintiffs fail to read the policy in its entirety. In doing so, it is clear to me that Plaintiffs have incorrectly interpreted the policy. The policy excludes most mold-related repairs from coverage and instead makes exceptions for a limited number of circumstances, including when mold is caused by fire, lightning, or an accidental discharge from a household appliance. Pls.' Ex. 7 at 29–30, 44.

Perhaps because they recognize the flaws in these arguments, Plaintiffs attempt to cover their bases by further arguing that if the policy is ambiguous, it should nonetheless be construed in their favor. Doc. 16 at 7. This argument is likewise unconvincing. It's true that ambiguous policy provisions should be construed in favor of coverage. *Shean*, 934 P.2d at 837. However, a provision is only ambiguous if, "upon being evaluated within the policy provision as a whole, it is reasonably susceptible to more than one meaning." *Id.* I am unpersuaded that the provisions covering mold damage are ambiguous in the first place. Even if the terms were ambiguous, it would be inappropriate to resolve the ambiguities on summary judgment.

Finally, Plaintiffs argue that the efficient proximate cause doctrine requires all the mold damage to be covered. Doc. 16 at 6–7. This doctrine provides that if two or more identifiable causes lead to a single property loss, the ensuing loss will be covered so long as one of those identifiable causes was included under the insurance policy. *Kelly v. Farmers Ins. Co.*, 281 F.

Supp. 2d 1290, 1296 (W.D. Okla. 2003). Plaintiffs argue that the mold was caused by the water intrusion, which was a covered peril; thus, even if other factors led to the mold growth, the remediation costs must still be covered. Doc. 16 at 6–7.

It's not clear whether Colorado courts have adopted the efficient proximate cause doctrine. *Compare Colo. Intergovernmental Risk Sharing Agency*, 207 P.3d at 842 *with Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678 (Colo. 1989). Even assuming it has been adopted, the doctrine must still "yield to a well-settled principle of law: namely, that courts will not rewrite a contract for the parties." *Kane*, 768 P.2d at 685. Therefore, the insurer is free to contract with the insured to circumvent the doctrine, but the policy "must explicitly and specifically disclaim coverage for losses that arise from a combination of excluded and covered causes, regardless of the sequence in which the various causes occurred." *Kelly*, 281 F. Supp. 2d at 1300.

For example, in *Kane*, the Colorado Supreme Court held that the doctrine was waived because the insurance policy excluded losses "caused by, resulting from, *contributed to*, or *aggravated by* any of the following: . . . flood." *Kane*, 768 P.2d at 684–85. There, governmental negligence caused a dam to fail, which led the plaintiffs' home downstream to flood. *Id.* at 685. Even though the plaintiffs' loss was caused both by government negligence and flooding, it was not covered because their insurance policy excluded flood damage and disclaimed the efficient proximate cause doctrine. *Id.* Similarly, the Colorado Court of Appeals determined that the following language was sufficient to disclaim the efficient proximate cause doctrine: "We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *Colo. Intergovernmental Risk Sharing Agency*, 207 P.3d at 843.

Even if this court has adopted the efficient proximate cause doctrine, CSAA effectively contracted out of it. As highlighted above, "Section I – Exclusions" includes the following language:

> A. We do not insure for any loss caused directly or indirectly by one or more of the excluded events set forth below in Exclusions A.1. through A.11., regardless of:
>
> (1) the cause of the excluded event; (2) other causes of the loss; (3) whether or not the other causes of the loss acted concurrently or in any sequence with the excluded event to produce the loss; (4) whether the loss occurs suddenly or gradually or involves isolated or widespread damage; (5) whether the loss arises from natural or external forces; or (6) whether the loss occurs as a result of any combination of (1) through (5). . . .

Pls.' Ex. 7 at 40–41. As stated earlier, Exclusion A.10. expressly provides that mold is not covered under the policy unless it is caused by fire, lightning, or an accidental discharge from a household appliance. *Id.* at 44. Even if the mold in Plaintiffs' home was caused in part by a covered peril, the parties have clearly disclaimed the efficient proximate cause doctrine.

Finally, Plaintiffs seemingly raise a new argument in their Reply to Defendant's Response. They allege Defendant should be required to cover all mold remediation costs because an insurer's decision to deny benefits must be evaluated based on the "information before the insurer at the time of that decision." *Peiffer v. State Farm Mut. Auto. Ins. Co.*, 940 P.2d 967, 970 (Colo. App. 1966); *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 848 (Colo. 2018). My interpretation of this argument is Defendant decided to cover all the damages that resulted from the wear and tear after it "conducted its investigation and examined the reports of the various experts," and thus Defendant should be bound to cover all mold remediation costs. *See* Doc. 22 at 2–3.

This argument cannot hold water for two reasons. First, Defendant informed Plaintiffs that their claim was partially covered on June 8, which was almost a month before any mold was

11

discovered in the home. Pls.' Ex. 5. This decision was also made well before Gardner Roofing inspected the home and suggested the mold was caused by longer-term problems. Def. ex. A. Second, Defendant informed Plaintiffs that only all "ensuing water damage" was covered. Pls.' Ex. 5. However, it is disputed whether the mold in the home was caused by water damage. Plaintiffs seem to assume this is the case, but Gardner Roofing's report suggests that the mold could have also been caused by the lack of ventilation in the roof. Doc. 20 at 2; Def. ex. A. Though Gardner Roofing does not conclusively say what caused the mold, it does cast some doubt on Plaintiffs' theory. This doubt presents a disputed material fact such that summary judgment would be inappropriate on these grounds.

In sum, Plaintiffs have failed to show an absence of any disputed material facts. Their interpretations of the insurance policy are arguably contrary to its plain language; at the very least, their disagreement with Defendant's interpretation indicates that there is a material dispute as to the scope of the mold coverage. Because Plaintiffs cannot avail themselves of the efficient proximate cause doctrine, summary judgment is not appropriate.

## CONCLUSION

Viewing the evidence in the light most favorable to Defendant and giving it the benefit of all favorable inferences, there remain disputed issues of material fact as to whether the insurance policy covered all of Plaintiffs' mold remediation costs.

Accordingly, Plaintiffs' Motion for Declaratory Judgment, or in the Alternative for Partial Summary Judgment (Doc. 16) is DENIED.

DATED this 26th day of August, 2019.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE